## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, a Delaware corporation, | ) ) ) | |
| | ) | Case No. 07 CV 229 |
| Plaintiff, | ) | |
| v. | ) | Hon. David H. Coar |
| | ) | United States District Judge |
| CHICAGO TRANSIT AUTHORITY, a municipal corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

### CHICAGO TRANSIT AUTHORITY'S MOTION TO DISMISS

NOW COMES Defendant, Chicago Transit Authority, an Illinois municipal corporation and unit of local government created pursuant to the Metropolitan Transit Authority Act, 70 ILCS 3605/1 *et seq.* (the "CTA"), by its attorneys Neal & Leroy, LLC, and pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and moves to dismiss the Complaint For Declaratory Judgment and Injunction ("the Complaint"), and in support thereof, states as follows:

### INTRODUCTION

On December 8, 2006, the CTA filed its Petition for Approval to Take Property (the "Petition") before the Illinois Commerce Commission (the "IllCC"). (Complaint, para. 26.) The Petition sought leave for the CTA to exercise its condemnation power to acquire the elevated rail tracks that it has leased from the Plaintiff since 1959. In response, the Plaintiff filed the instant Complaint to enjoin the proceedings before the IllCC. Additionally, the Complaint requests that this Court declare the CTA's condemnation authority is preempted by the Interstate Commerce Commission Termination Act, (the "ICCTA"), 49 U.S.C. §10101 (2006) *et seq.*

The Complaint fails to state a cause of action under the ICCTA because the ICCTA does not apply to local governmental authorities that provide mass transportation services. Second, injunctive relief is improper under the Anti-Injunction Act, 28 U.S.C. §2283 (2006). Third, this court should abstain from enjoining the proceedings before the IllCC under principals of comity, federalism, or the *Younger* doctrine. Finally, declaratory relief is improper because the Plaintiff can obtain a declaratory relief from the IllCC.

## FACTS

The following facts appear in the Plaintiff's Complaint and accompanying exhibits and the Petition and accompanying exhibits.[1] Other than unsupported conclusions, all facts are taken as true for the purpose of this motion to dismiss. *Bontkowski v. First National bank of Cicero,* 998 F.2d 459, 461 (7th Cir. 1993).

### History of CTA's "Green Line"

The CTA through operation of its "Green Line" provides mass transportation service to commuters traveling between Chicago and Oak Park, Illinois. (Petition, para. 3.) Prior to 1959, the CTA operated services on the Green Line from Laramie Avenue in Chicago, to a point beyond Harlem Avenue in Oak Park, Illinois at street level. (Complaint, para. 9.) Union Pacific, or the predecessor entity, the Chicago North Western Railway Company, owns elevated structure and rail tracks from Laramie Avenue in Chicago, to a point beyond Harlem Avenue in Oak Park, Illinois. (Complaint, paras. 8-9.)

---

[1] This Court may take judicial notice of CTA's Petition for Approval to Take Property, because it is referred to in the Plaintiff's Complaint. *See Menominee Indian Tribe of Wisconsin v. Thompson,* 161 F.3d 449, 456 (7th Cir. 1998) (holding that district court properly took judicial notice of historical documents, and in so doing did not convert the motion to dismiss into a motion for summary judgment). A copy of the Petition is attached.

## CTA Lease With Union Pacific

On January 6, 1959, Plaintiff and CTA signed a lease which provided that CTA would pay rent on a monthly basis for the exclusive use of two elevated rail tracks. The tracks provide mass transit passenger service between Laramie Avenue and Harlem Avenue. (Complaint, paras. 8-9, and Lease para. 1, p. 2.) The Lease also provides mutual obligations and rights with respect to "joint facilities." The Lease defines "joint facilities" as "the north and south retaining walls, abutment walls, grading, the bridges over the north and south streets which pass through the right of way, Oak Park station subway, streets and street facilities under the right of way, the drainage facilities and all other jointly used facilities." (Lease, para. 4, p. 5.) The Lease further provides that Plaintiff and CTA will share any expenses and liability associated with the joint facilities. (Lease, paras. 5 and 7.)

While the Lease imposes liability and responsibility on both the Plaintiff and CTA for the joint facilities the operation of and costs associated with the leased tracks are the responsibility of the CTA. Paragraph 5, page 7 of the Lease provides that "[t]he lessee at all times during the term of this lease shall maintain at its sole costs and expense the tracks, platforms, stations, stairway and other facilities used by it." Additionally, paragraph 4, page 5 of the Lease provides that "[t]he lessee at all times during the term of this lease shall have full and exclusive right, power and authority to occupy, control, manage and operate all of the demised property and such additional railroad tracks, buildings and other facilities as it may deem desirable."

## CTA Seeks To Acquire Its Leasehold Interest

For nearly fifty years, CTA has used the leased tracks to provide mass transportation services. (Petition, para. 3.) The Plaintiff does not allege that the CTA has interfered with Plaintiff's use of its own three lines on the elevated structure. (Complaint, paras. 8 and 15.)

3

On June 14, 2006, the CTA Board passed a resolution authorizing the acquisition of its leasehold interest. (Petition, Exhibit C.) On or about July 12, 2006, CTA offered to pay the Plaintiff $7,564,400.00 to purchase its leased tracks and related property. (Petition, Exhibit C.) The Plaintiff declined the CTA's offer, and on December 8, 2006 CTA filed a Petition for Takeover before the IllCC. The IllCC proceeding is a prerequisite to filing a condemnation. 65 ILCS 5/7-102. The IllCC will review the proposal in terms of public convenience and necessity. See, e.g., 220 ILCS 518-406, 8-502, 8-508.

## ARGUMENT

**I.     THE SURFACE TRANSPORTATION BOARD DOES NOT HAVE JURISDICTION UNDER THE INTERSTATE COMMERCE COMMISSION TERMINATION ACT**

Plaintiff's claim is that the CTA's eminent domain power is preempted by §10501(b) of the ICCTA. However, the ICCTA does not apply to the CTA's proposed acquisition. The Surface Transportation Board ("STB"), the agency charged with administering the ICCTA, does not have jurisdiction over the CTA's acquisition of the mass transit leasehold interest. Specifically, the ICCTA contains a provision, §10501(c)(2), exempting mass transportation services provided by a local governmental authority. The provisions regarding jurisdiction of the STB are as follows:

(b) The jurisdiction of the Board over-- * * *

    (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

(c)(1) In this subsection—

4

(A)  the term "local governmental authority:--

    (i)  has the same meaning given that term by section 5302(a) of this title; and[2]

    (ii)  includes a person or entity that contracts with local governmental authority to provide transportation services; and

(B)  the term "mass transportation" means transportation services described in section 5302(a) of this title that are provided by rail.[3]

(2)  Except as provided in paragraph (3) [relating to safety, collective bargaining and employment benefits], *the Board does not have jurisdiction under this part over mass transportation provided by a local governmental authority.*  (Emphasis added.)

49 U.S.C. §10501(b)-(c).

The STB has interpreted its statute to exclude jurisdiction of mass transit agencies' acquisition of rail lines.  In *Transit Solutions Group LLC*, Docket No. 34832, 2006 WL 560785 (S.T.B. 2006), Transit Solutions Group ("TSG") initiated an action before the STB to commence common carrier rail passenger service over tracks owned by the Nashville and Eastern Railroad Authority.  The proposed passenger service would operate in Tennessee, a distance of 32 miles, as an agent of the Regional Transit Authority, a public body created by the Tennessee General Assembly for planning and implementing transit services.

The STB found that it did not have jurisdiction over the acquisition, stating that "[a]lthough the Board generally has jurisdiction over rail transportation that is part of the interstate rail network, 49 U.S.C. 10501(a), TSG proposed operations were specifically exempted from the Board's jurisdiction by 49 U.S.C. 10501(c)."  The STB also found that TSG proposed

---

[2] 49 U.S.C. 5302(a)(6)  provides that "local governmental authority" includes "a political subdivision of a State . . . and a public corporation, board, or commission established under the laws of a State."

[3] 49 U.S.C. 5302(a)(7) provides that the "mass transportation" means "transportation by a conveyance that provides regular and continuing general or special transportation to the public, but does not include school bus, charter or sightseeing transportation."

operations would provide mass transportation by a local governmental authority, and therefore its operations were outside of the STB's jurisdiction. The STB stated that even if TSG's contemplated operations did not fall within the 10501(c), the Board would still lack jurisdiction because it does not have jurisdiction over transportation that is not part of the interstate rail network. The STB found that there was no evidence that TSG's passengers would be traveling on the line that would operate as part of an interstate trip, or that TSG would participate in an interstate movement of freight.

The facts of the instant case are strikingly similar to those in *Transit Solution Group*. First, like TSG, the CTA is a local governmental authority that provides mass transportation services. Second, like TSG, the CTA does not provide transportation over an interstate rail network. Finally, like TSG, there is no allegation, nor could there be, that CTA's passengers would travel on a line that would operate as part of an interstate trip, or that CTA would participate in interstate movement of freight. If the STB lacked jurisdiction in *Transit Solutions Group*, it is clear that it would also lack jurisdiction in the instant case. Courts should give deference to an agency interpreting its own statue and regulations. *See, United States Transportation Union v. Surface Transportation Board* 169 F.3d 474, 476 (7th Cir. 1999) (affirming STB's decision and holding that high level of deference accorded to STB's reasonable interpretation of the statues which it administers).

In *Massachusetts Bay Commuter Railroad Company LLC*, Docket No. 34332, 2003 WL 21359920 (S.T.B. 2003), the Massachusetts Bay Commuter Railroad Company ("MBCR") petitioned the STB for a declaratory order. The MCBR had signed an agreement with the Massachusetts Bay Transit Authority ("MBTA") to operate its commuter rail system consisting of 13 lines, totaling approximately 350 route miles in the Boston, Massachusetts area. The

6

MCBR sought a declaratory order that its operations would fall within the statutory exception of mass transit, §10501(c)(2), and therefore the STB would not have jurisdiction.

The STB found that MCBR would not be subject to its jurisdiction because the board does not have jurisdiction over mass transportation provided by a local government authority. The STB found that the MCBR and the MBTA were local government authorities under 49 U.S.C. 5302(a)(6). Additionally, the STB found that commuter rail service that MCBR would provide satisfied the definition of "mass transit" contained in 49 U.S.C. 5302(a)(7).

Although the CTA clearly falls within the §10501(c)(2) exception, any argument that the STB could exercise jurisdiction under §10501(b)(2) would be equally flawed. Section 10501(b)(2) allows the STB to take jurisdiction when there is an acquisition of tracks. However, the STB has previously interpreted §10501(b)(2) and found that it does not have jurisdiction under §10501(b)(2) when a commuter rail service operations does not unreasonably interfere with regulated rail service. *See, Sacramento Regional Transit District* Docket No. 33796, 2000 WL 893421 (S.T.B. 2000). In this case, the Plaintiff has only set forth conclusory allegations, and has failed to definitively state how the CTA's acquisition of the property that CTA has leased for nearly fifty years would unreasonably interfere with Plaintiff's operations. The CTA is simply seeking to acquire its leasehold interest and cease paying rent to the Plaintiff. The remaining duties and obligations set forth in the Lease remain unchanged.

The STB cannot exercise jurisdiction over the CTA under the ICCTA, and the Plaintiff has failed to state a claim for relief.

## II. PLAINTIFF'S REQUEST FOR RELIEF IS IMPROPER UNDER THE ANTI-INJUNCTION ACT

The Plaintiff's request to enjoin the CTA from taking any further action in the IllCC to condemn the right of way that it leases is impermissible under the Anti-Injunction Act. The

Anti-Injunction Act generally prohibits federal courts from enjoining state proceedings unless the injunction falls within a specified exception. The Anti-Injunction Act provides:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction or to protect or effectuate its judgments.

28 U.S.C. §2283 (2006).

"On its face the present Act is an absolute prohibition against enjoining State Court proceedings, unless the injunction falls within one of the three specifically defined exceptions." *Atlantic Coast Line Railroad Company v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 286, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970). The United States Supreme Court has recognized that the exceptions are narrow and "should not be enlarged by loose statutory construction." *Chick Kam Choo v. Exxon Corp.* 486 U.S. 140, 146, 108 S.Ct. 1684, 1689 100 L.Ed.2d 127 (1988).

### A. The Plaintiff's Request for Injunctive Relief Does Not Fall Within An Exception of the Anti-Injunction Act

In this instance, the Plaintiff's request to enjoin the CTA from continuing its condemnation proceeding does not fall within any of the exceptions set forth in the Anti-Injunction Act. As stated above, Plaintiff alleges that the ICCTA preempts state regulation of rail transportation. However, the ICCTA does not expressly provide or authorize a federal court to grant injunctive relief. Similarly, enjoining the CTA condemnation proceeding is not necessary to aid this court of its jurisdiction. Finally, enjoining the state condemnation proceeding would not protect or effectuate this court's judgment since there has been no litigation of matters finally adjudicated in federal court. *See Kerr-McGee Chemical Corporation v. Hartigan* 816 F.2d 1177, 1179 (7th Cir. 1987) ("[t]he exception to "protect or effectuate its judgments" was added in 1948 to permit federal courts to enjoin litigation of matters finally adjudicated in federal court").

8

Since the requested injunctive relief does not fall within any of the exceptions of the Anti-Injunction Act, the Plaintiff's request for injunctive relief must be denied, and the CTA's condemnation proceeding must continue in state court. "Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court." *Atlantic Coast Line Railroad Company,* 398 U.S. at 287. "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Id.* at 297.

### B. Plaintiff's Argument of Preemption Does not Preclude Application of the Anti-Injunction Act

As shown above, the Plaintiff has failed to state a claim establishing that the ICCTA applies to the CTA. Moreover, even if the ICCTA did apply, the Plaintiff's preemption argument would not preclude the application of the Anti-Injunction Act. "A federal court does not have inherent power to ignore the limitations of §2283 and to enjoin state proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is clear." *Atlantic Coast Line Railroad Company*, 398 U.S. at 294. *See also Amalgamated Clothing Workers of America v. Richman Brothers* 348 U.S. 511, 515, 75 S.Ct. 452, 455, 99 L.Ed. 600 (1955); *Chick Kam Choo v. Exxon Corp.* 486 U.S. at 149-150.

The Plaintiff's request that this Court enjoin the condemnation proceedings initiated by the CTA before the IllCC must be denied because there is no applicable exception under the Anti-Injunction statute. Moreover, the United States Supreme Court precedent clearly demonstrates that Plaintiff's assertion of preemption under the ICCTA is not sufficient to preclude application of the Anti-Injunction Act.

### III. THIS COURT SHOULD ABSTAIN FROM ENJOINING THE STATE CONDEMNATION PROCEEDING UNDER THE DOCTRINE OF YOUNGER v. HARRIS

The Plaintiff's request for injunctive relief is improper not only under the Anti-Injunction Act, but also under principles of comity and federalism. In *Younger v. Harris,* 401 U.S. 37, 41, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971) the appellee was indicted for violating a California criminal statute. The appellee filed a complaint in federal court asking the court to enjoin further prosecution under the state court proceeding, which was granted by the District Court. On appeal, the United States Supreme Court reversed, holding that "absent extraordinary circumstances, federal courts must abstain from ongoing state criminal proceedings." Additionally, the Court held

> This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of "comity" that is a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate state functions in their separate ways.

*Id.* at 44.

The *Younger* doctrine has been expanded to include civil actions in state courts concerning state interests and state administrative proceedings, such as that before the IllCC, that are judicial in nature. *See Trust & Investment Advisers, Incorporated v. Hogsett,* 43 F.3d 290, 294 (7th Cir. 1994) (Proceeding before the Indiana Securities Division which was judicial in nature). Under the *Younger* doctrine, abstention by the federal court is appropriate when the following three criteria are met: (1) the judicial or judicial in state proceedings must be on-going; (2) the proceedings must implicate important state interests; and (3) there must be an adequate opportunity in the state court proceeding to raise constitutional challenges. *Id.* at 295.

A.    **Abstention by This Court Is Appropriate Under the *Younger* Doctrine**

In this instance, abstention by this court is appropriate under the *Younger* doctrine.  The

Plaintiff filed its Complaint on January 12, 2007.  However, on December 8, 2006, the CTA filed

its Petition before the IllCC, seeking leave to acquire the elevated rail tracks pursuant to its

eminent domain power.  As such, there is an ongoing judicial state proceeding.

The state proceedings implicate important state interests. Specifically, the CTA seeks to

acquire its leased right of way pursuant to its eminent domain powers.  In *State of Georgia v.*

*Chattanooga*, 264 U.S. 472, 480, 44 S.Ct. 369, 370, 68 L.Ed. 796 (1924) the Supreme Court held

that the power of eminent domain is an attribute of sovereignty, and inheres in every independent

state.  *See also Green Street Association v. Daley,* 373 F.2d 1 (7th Cir. 1967) (holding that the

power of eminent domain is an attribute of sovereignty and essential to the life of the state).

Finally, the Plaintiff has an opportunity to raise any constitutional challenges and its

preemption argument in the IllCC proceeding.   83 Ill. Adm. Code 200.190(a) provides that

"[m]otions may be presented requesting . . . the dismissal of the proceeding for want of

jurisdiction.   In fact, the Plaintiff filed a Motion to Dismiss before the IllCC under

Section 200.190(a).  Instead of proceeding with its defense in the state proceeding, the Plaintiff

has instead run to this court, a court of limited jurisdiction.  "A party may not invoke the aid of

federal court, alleging that his state remedies are inadequate, without having first tested the

sufficiency of those remedies and having found them to be wanting."  *Duke v. State of Texas*,

477 F.2d 244, 252 (5th Cir. 1973).

B.    **It Is Proper to Abstain From Enjoining State Condemnation**
       **Proceedings**

Federal courts have held that it is proper to abstain from enjoining condemnation

proceedings in state court because litigants may assert their defenses to condemnation in the state

11

court proceedings. In *Ahrensfeld v. Stephens* 528 F.2d 193 (7th Cir. 1975), the Village of Rosemont passed a resolution to acquire property by eminent domain to construct an athletic and convention center. The property owners filed a lawsuit in federal court seeking to stop the eminent domain proceeding to acquire their properties, requesting injunctive, declaratory and monetary relief. The property owners alleged that the condemnation of their homes violated the fifth and fourteenth amendments of the Constitution. The Seventh Circuit affirmed the District Court's abstention.

The Seventh Circuit noted that "[s]everal federal courts had opined that state eminent domain proceedings should not be interfered with by federal courts because their local nature makes interference unwise." *Id.* at 198. Additionally, the court found that abstention was proper because the property owners could raise the crux of their federal constitutional claims in the pending state proceedings and that there is a presumption that an Illinois court would properly determine any federal questions. *Id.* at 198-199. The court also found that the raising of federal constitutional claims attacking the eminent domain proceedings in state court did not preclude abstention. Specifically, the court stated "[s]ince there is a possibility of a federal question in every taking by eminent domain under state authority, Nichols, Law of Eminent Domain, §413 (2) 1973, such a factor would nearly always preclude abstention in this type of case." *Id.* at 199.

Other cases also found that it is proper to abstain from enjoining state condemnation proceedings. In *Harrison-Halsted Community Group v. Housing and Home Finance Agency*, 310 F.2d 99 (7th Cir. 1962) the Seventh Circuit affirmed the district court's dismissal of complaint for declaratory judgment and injunction to prevent City of Chicago from proceeding with plan to acquire property under an urban renewal program. In *Residents of the New Ritz Hotel v. City of Chicago*, 2001 WL 58958 *6 (N.D. Ill. 2001) the court discussed four prior cases

in which the Seventh Circuit refused to enjoin state proceedings and found that the state court is the proper forum to challenge a condemnation.

It is clear that abstention is proper in this case. The Plaintiff is able to assert any defenses, including constitutional defenses before the IllCC. Moreover, as stated above, federal courts have overwhelmingly found that state courts should address issues concerning eminent domain or condemnation.

## IV.  THE PLAINTIFF'S REQUEST FOR DECLARATORY RELIEF SHOULD BE MADE BEFORE THE IllCC

The Plaintiff's request for declaratory relief cannot be granted. In the Complaint, the Plaintiff requests that this Court declare that the ICCTA, 49 U.S.C. §10101 (2006) *et seq.* preempts the CTA's condemnation authority. The Plaintiff also seeks a declaration that the CTA's use of condemnation authority is an impermissible deprivation of its rights under the United States Constitution. In *Ahrensfeld*, the court found that the property owners' request for declaratory relief was sufficient interference with the state court proceedings which warranted the district court staying its hand. *Ahrensfeld*, 528 F.2d at 195. Additionally, the court stated that "[i]n the exercise of discretion federal court should normally deny a declaratory judgment where the issues raised may be fully adjudicated in a suit pending in a state court at the time the federal declaratory judgment action is instituted." *Id.* at 197. Like the property owners in *Ahern*, the Plaintiff's request for declaratory relief is improper because its argument can be raised in the pending state court proceeding. Moreover, pursuant to 83 Ill. Adm. Code Section 200.220 (a), the Plaintiff has the right to specifically request a declaratory ruling from the IllCC

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant, Chicago Transit Authority, prays that this Court enter an order dismissing Union Pacific Railroad Company's Complaint for Declaratory Judgment and Injunction.

Respectfully submitted,

**The Chicago Transit Authority**, an Illinois municipal corporation and unit of local government

By: _____/s/ Richard F. Friedman_____
One of its Attorneys

Richard F. Friedman (ARDC No. 0885959)
Francine D. Lynch
Jacinta Epting
NEAL & LEROY, LLC
203 North LaSalle Street, Suite 2300
Chicago, Illinois 60601
(312) 641-7144

14

STATE OF ILLINOIS    )
                    )   SS

COUNTY OF C O O K   )

STATE OF ILLINOIS
ILLINOIS COMMERCE COMMISSION

| | |
|---|---|
| CHICAGO TRANSIT AUTHORITY, a Municipal Corporation, | |
| The Petitioner | Docket No. |
| vs. | |
| UNION PACIFIC RAILROAD COMPANY, a Delaware Corporation; and UNKNOWN OWNERS, generally    -   Respondents | T 06 - 0104 |
| Petition for approval of the taking of an easement owned by a transportation common carrier in Chicago, Illinois by exercising the right of eminent domain | |

## PETITION FOR APPROVAL TO TAKE PROPERTY

TO THE ILLINOIS COMMERCE COMMISSION:

The CHICAGO TRANIST AUTHORITY, a municipal corporation, State of Illinois, by its

attorneys, EUGENE MUNIN, Acting General Counsel, and NEAL & LEROY, L.L.C., special

counsel, requests approval of the Illinois Commerce Commission for the taking and/or damaging of

certain properties owned by UNION PACIFIC RAILROAD COMPANY, a Delaware Corporation

(the "Railroad"), a public transportation common carrier subject to the jurisdiction of the ILLINOIS

COMMERCE COMMISSION.

     1.     That by virtue of the provisions of an Act of the General Assembly of the State of Illinois

entitled the "Metropolitan Transit Authority Act" 70 ILCS 3605/1 et seq. as amended, and adopted by the

1

electors of the City of Chicago on June 4, 1945, and pursuant to Illinois Code of Civil Procedure 735 ILCS 5/7-101 et seq., Plaintiff is authorized to acquire, construct, own, operate and maintain for public service a transportation system in the Metropolitan Area of Cook County, Illinois and is vested with all the powers necessary and convenient to accomplish the purposes of said act, including the right to acquire by condemnation any property necessary, convenient and desirable for the purposes of the Authority.

2.     Pursuant to Section 10 of the Act, the Authority has the right of eminent domain to acquire property of any railroad which is not used for the transportation of persons or property and to acquire rights and easements across, under or over the right of way of such railroad.

3.     Currently the Authority leases property from Union Pacific Railroad Company successor in interest to Northwestern Transportation Company by lease dated January 6, 1959 as amended and known as agreement 69974, July 15, 1960 lease and Addendum to said lease dated May 19, 1969 which the Authority uses to provide mass transit service for the Green Line. That the operation of the Green Line transit line can not be maintained without said easements. (Copies of the leases are attached hereto as Group Exhibit B).

4.     Pursuant to the terms of the lease as amended said lease may be terminated with notice.

5.     The Railroad is subject to the jurisdiction of the Commission.

6.     The Railroad is title holder to the subject property and the certain easement, said property being located in the City of Chicago, County of County, and the legal description of which is attached hereto and marked as Exhibit A.

2

7.     The CTA has been authorized to acquire a permanent easement legally described on attached Group Exhibit B, and it is necessary for the CTA to acquire said property for continued operation.

8.     The terms of the compensation to be paid by the CTA for the easement as described on attached Group Exhibit B cannot be agreed upon between the CTA and the Railroad, although the CTA has attempted to effect such an agreement (see attached exhibit C.) The CTA, therefore, is authorized and desires to proceed to acquire the easement under the eminent domain laws of this State.

9.     Section 7-102 of the Code of Civil Procedure (735 ILCS 5/7-102) requires the CTA to obtain approval of the Commission prior to the taking of the Railroad's property described in Group Exhibit B.

WHEREFORE, the CTA requests the Commission to approve the taking of the easement as described on the attached Group Exhibit B of the Railroad by the exercise of the right of eminent domain.

CHICAGO TRANSIT AUTHORITY,
Eugene Munin, Acting General Counsel

By: _____
      Neal & Leroy, LLC

Eugene Munin
Acting General Counsel
Chicago Transit Authority

Langdon D. Neal
Francine D. Lynch
Neal & Leroy , LLC
Special Assistant Counsel
203 N. LaSalle Street, Suite 2300
Chicago, IL 60601
312/641-7144

Douglas Felder
203 N. LaSalle Street, Suite 2300
Chicago, IL 60601
312/634-3509

3

S:\Clients\CTA\Union Pacific\Petition for Taking - ICC (2).doc

STATE OF ILLINOIS )
                  ) SS
COUNTY OF C O O K )

     I, Francine D. Lynch, being first duly sworn, upon oath, depose and say that I am a Special Assistant Counsel for the Chicago Transit Authority, that I have read the above and foregoing Petition by me subscribed, I have knowledge of the contents thereof, and that on information and belief said contents are true and correct.

                                  Francine D. Lynch

SUBSCRIBED and SWORN
to before me this 5th day of
December 2006

     Notary Public

OFFICIAL SEAL
LAURI GORCOWSKI
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/03/09

## AFFIDAVIT OF SERVICE

     I, Francine D. Lynch, being first duly sworn, on oath, states that she served the foregoing Petition upon the following addresses at their respective addresses set forth:

### VIA CERTIFIED MAIL

**Illinois Commerce Commission**
527 East Capitol Avenue
Springfield, Illinois 62708
Attention: Dave Lazarides

**U.S. MAIL**
John J. Lawlor
Sonnenschein Nath & Rosenthal
7800 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606

**U.S. MAIL**
Dennis D. Brown
Union Pacific Railroad Company
1400 Douglas Street – Stop 1690
Omaha, NE 68179

by enclosing a copy of said Petition, together with Exhibit A and Group Exhibit B to said Petition, in an envelope correctly addressed by certified mail, return receipt request postage affixed thereto, sealed and deposited said envelopes in the U.S. Mail Chute at 203 North LaSalle Street, Chicago, Illinois, before 5:00 p.m. on the 5th day of December 2006.

SUBSCRIBED and SWORN
to before me this 5th day of
December 2006

     Notary Public

S:\Clients\CTA\Union Pacific\Petition for Taking - ICC (2).doc

4

OFFICIAL SEAL
LAURI GORCOWSKI
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/03/09

EXHIBIT A

PARCEL 1(A)

A STRIP 100 FT WIDE RAILROAD RIGHT-OF-WAY EAST AND WEST THROUGH SECTION 7, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN EXCEPT THAT PART IN THE OAK PARK TAX INCREMENT DISTRICT.

PARCEL 1(B)

A STRIP OF RAILROAD RIGHT-OF-WAY THROUGH 12.08 ACRES OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST THE THIRD PRINCIPAL MERIDIAN.

PARCEL 1(C)

A STRIP 100 FT. WIDE RAILROAD RIGHT-OF-WAY NORTH AND WEST THROUGH THE EAST ½ OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN.

PARCEL 1(D)

A STRIP 100 FT. WIDE RAILROAD RIGHT-OF-WAY EAST AND WEST THROUGH 12.28 ACRES OF SECTION 9, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN.

P.I.N.  16-07-500-002 (part)
     16-07-500-003 (part)
     16-08-500-001 (part)
     16-08-500-002 (part)
     16-09-500-004 (part)

Harlem Yard 1960 Lease
(West of Harlem Avenue)
P.I.N. 15-12-501-001 (part)

A STRIP 100 FT. WIDE RAILROAD RIGHT-OF-WAY WEST AND THROUGH THE EAST 1/4 OF SECTION 12, TOWNSHIP 39 NORTH RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN.

LEASE No. 69974

4-x

11-25-58

THIS INDENTURE, made this 6th day of January ,

1959, between CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a

corporation, as Lessor, and CHICAGO TRANSIT AUTHORITY, a municipal

corporation of Illinois, as Lessee, WITNESSETH:

Whereas, the Lessor is a railroad corporation organized and

existing under the laws of the State of Wisconsin which owns the right of

way in the City of Chicago and in the Village of Oak Park immediately north

of and parallel to the Lake Street branch of the Rapid Transit Division of

the Lessee from Laramie Avenue in the City of Chicago west through the

Village of Oak Park, and

Whereas, the Lessor has agreed to lease a part of its right

of way to the Lessee from the west line of Laramie Avenue in the City of

Chicago to the west line of Harlem Avenue in the Village of Oak Park in

order to provide a right of way for the Lessee elevated from ground level

where the Lessee now operates, and

Whereas, in order to provide funds for the necessary con-

struction, the City of Chicago, State of Illinois, the Village of Oak Park

and the Chicago Transit Authority have agreed to contribute to the payment

of the initial costs of said project,

Now, Therefore, this indenture witnesseth:

1.

The Lessor, for and in consideration of the rents, covenants

and conditions herein expressed on the part of the Lessee, to be paid, kept

and performed, does hereby lease for passenger transportation purposes



EXHIBIT
Group
B

-2-

unto the said Lessee, its successors and assigns that part of the right of way of the Lessor, located in the City of Chicago and the Village of Oak Park State of Illinois, as shown on the plat attached hereto marked Exhibit A, reserving unto Lessor the right to use the property under and over said right of way, providing such use by Lessor does not interfere with Lessee's use of said right of way for passenger transportation purposes. The Lessor will sell and convey to the Lessee the two tracks now on said demised right of way for $136,500.00 which represents one-half the present depreciated value of said two tracks effective when the additional track and facilities specified in the construction contract between the parties have been turned over to Lessor.

To have and to hold said right of way and all benefits and advantages thereof for passenger transportation purposes unto the said Lessee for and during and until the full term of this perpetual lease, provided, however, that this lease shall terminate at any time the Lessee or Lessor or their respective successors discontinue transportation operations on said right of way.

2.

The Lessee, its successors and assigns, in consideration of the premises and of the covenants herein contained on the part of the Lessor, will pay to the Lessor as and for the rent of said premises the sum of $14,066.67 monthly, beginning one year after the date when the two tracks are released to Lessee by Lessor and on the first day of each month thereafter during said term or beginning on the date Lessee commences passenger operation, whichever is sooner.

The estimated amount of the taxes for the year 1956 on the

-3-

entire right of way of the Lessor from the eastern point of the leased prop-
erty to the western point of the leased property is $74,000.00, and 40% of
said sum, or $29,600.00, is included as part of the annual rental to be paid
by the Lessee hereunder. The Lessor will recompute such applicable taxes
when finally determined at the end of each five-year period in the same manner
used to compute the amount of $74,000.00, and the rental will then be adjusted
accordingly. In addition, any increase in the annual Illinois ad valorem taxes
allocable to and occasioned by rentals received by the Lessor from the demised
property shall be added to rentals for the next five-year period and the rental
automatically adjusted accordingly. In the event the property herein demised
is exempted from real estate and personal property taxes because of its use
by the Lessee (or otherwise) the future rental to be paid hereunder, after the
effective date of such exemption, shall be reduced by the amount of such ex-
emption. The Lessee will pay 40% of any special assessment levied against
Lessor's property described in the following paragraph.

At the end of ten years following the date of the first payment
of rent hereunder and at the end of each ten-year period thereafter it is
agreed that an appraisal of the land herein leased shall be made and an ad-
justment of the rental shall be made based upon the proportion the appraised
value bears to the present appraised value of said property. It is agreed that
the area of the right of way (consisting of both that part retained by the Lessor
and that part leased hereunder) between the east and west boundaries shown
on Exhibit A comprises 1,221,000 square feet of property and that the total
appraised value of said property is $1,940,000.00 on the date of the begin-
ning of the term of this lease.

If the parties hereto are not able to agree to the amount of the
appraised value at the end of any ten-year period, it shall be submitted to

-4-

three appraisers to be chosen, one by each party hereto and the third by the two so chosen; the parties shall appoint their respective appraisers thirty days prior to the end of such ten-year period; if the appraisers so appointed are unable to agree upon the third appraiser within the thirty-day period ending with said ten-year period, such third appraiser may be appointed by any person sitting as judge of the District Court of the United States for the district and division in which Cook County, Illinois is then located upon ten days' notice in writing of the application for said purpose. The appraisers chosen as aforesaid shall immediately determine the valuation of the area of the right of way at the end of said ten-year period and shall notify the parties of their decision whereupon the rental to be paid for the ensuing ten-year period shall be based upon the valuation so determined. If there is an increase in the value of the land the Lessee will pay 10% of 40% of the increase in value as additional annual rental. If there is a decrease in the value of the land the annual rental shall be decreased by 10% of 40% of the decrease in value.

3.

The Lessor, for itself, its successors and assigns, in consideration of the premises. covenants and agrees with the Lessee, its successors and assigns, that the Lessor is well seized of and entitled to the possession of all and singular the property hereby demised and that the Lessee, observing and fulfilling the covenants on its part herein contained, shall during the term hereby granted have, use, occupy and possess the said right of way and the granted premises for passenger transportation purposes and receive and enjoy to its own use the earnings and income thereof.

-5-

The Lessee shall have the right to enter into agreements with respect to advertising on space in the Lessee's stations, platforms and otherwise on the demised premises, but not on joint property, and the revenues derived from such advertising shall be the property of the Lessee.

4.

The Lessee at all times during the term of this lease shall have full and exclusive right, power and authority to occupy, control, manage and operate all of the demised property and such additional railroad tracks, buildings and other facilities as it may deem desirable. Subject to prior written approval of Lessor's Chief Engineer, Lessee may make such additions, alterations, or changes to the demised property as it may deem proper.

All tracks which are now upon the demised property and all tracks, buildings, electrical, signal and communications equipment and other facilities which may hereafter be placed upon the demised property by the Lessee shall be deemed to be the sole property of the Lessee and shall so remain until and unless acquired by the Lessor, as herein provided. Upon the termination of this lease the Lessor may, at its option, purchase all or any part of such tracks, buildings, equipment and other facilities installed at the expense of the Lessee, at the then net salvage value of the facilities. Should the Lessor fail to exercise said option as to any of such tracks, buildings or other facilities, the Lessee shall, at its expense, remove the same from the demised property, and failure to so remove within a reasonable time shall be considered an abandonment thereof.

-6-

5.

When used in this lease the term "joint facilities" shall mean the north and south retaining walls, abutment walls, grading, the bridges over the north and south streets which pass through the right of way, Oak Park station subway, streets and street facilities under the right of way, the drainage facilities, and all other jointly used facilities.

In the event the Lessor decides it is necessary to construct what it considers to be a new joint facility (in addition to those specified above) or an improvement to an existing joint facility which is not a re-placement of an existing joint facility, it shall notify the Lessee and, upon the agreement of the parties hereto as to the necessity for and the cost of such joint facility, which agreement shall not be unreasonably withheld, upon receipt of a statement showing the expenditures incurred in the con-struction thereof the Lessee will reimburse the Lessor for an amount equal to 40% of the amount expended therefor.

Whenever in the opinion of Lessor any maintenance or replace-ment of any joint facility chargeable to operating expenses must be under-taken, Lessor will accomplish such maintenance or replacement and Lessee will promptly reimburse Lessor for an amount equal to 40% of the cost there-of upon receipt of a statement showing such cost. Lessor shall be bound to use only reasonable and customary care in maintaining, repairing and renew-ing the joint facilities, and Lessee shall not by reason of any defect in a joint facility or by reason of failure of Lessor to repair any such defect, have nor make any claim or demand against Lessor for any loss, damage, injury or death whatsoever arising from such defect or failure. If Lessor fails to repair or renew any such defect within a reasonable time after Lessee has

-7-

given written notice to Lessor specifying the defect and requesting that the same be repaired, then Lessee shall have the right to make the necessary repairs or renewals and Lessor shall pay 60% of the costs of such repairs or renewals.

Whenever, in the opinion of the Lessor, any replacement or enlargement of any existing joint facility chargeable to Capital Account is necessary, the cost of reproduction new of such joint facility as of the date of replacement shall be determined by agreement between Lessor and Lessee. After such replacement or enlargement, the Lessee will reimburse the Lessor for 40% of the difference in cost between the cost of such new facility installed and the cost of reproduction new as of December 31, 1957 of the facility retired. Also, the Lessee shall pay 40% of all operating expenses in connection with such replacement or enlargement of any existing joint facilities.

The Lessee at all times during the term of this lease shall maintain at its sole cost and expense the tracks, platforms, stations, stairway and other facilities used exclusively by it. Where any construction, replacement or maintenance is performed by one of the parties either for the other party or for the joint benefit of the parties hereto, and the costs are to be allocated between the parties, overheads shall be added in accordance with the Rules and Regulations of the General Managers' Association of Chicago which are in force at the time said work is done. Lessee shall not undertake any work, the cost of which is to be borne in fact by Lessor, without prior written approval of the Chief Engineer of Lessor.

Construction of new facilities, after the initial construction of facilities for the sole use of the Lessee is completed, and during the term of this lease shall be made by the Lessee or by contract entered

-8-

into by Lessee at the cost of the Lessee, provided, however, that Lessor's approval to such new construction or changes shall first be obtained. Title to all such new facilities constructed or installed for the sole use of the Lessee shall be retained by the Lessee.

Lessee shall promptly pay in full all license fees or similar charges which are assessed against Lessor because of its ownership of the premises herein leased to Lessee.

6.

The Lessee will at all times during the term of this lease, at its expense, operate a public passenger transportation system upon said right of way and maintain and keep the same and everything appertaining thereto in good order, condition and repair as soon as the construction of the stations, stairways tracks, signal and electrical systems, and all other necessary facilities are completed so that the Lessee can conduct transportation on the demised right of way during the term hereby granted, and will operate the same and furnish such materials, rolling stock, equipment, supplies and other things as shall be requisite for that purpose.

7.

Each party will be liable for all claims and causes of action for personal injury, death and property damage of every kind and nature proximately caused by its own negligence or the negligence of its servants, agents or employes, except for claims or causes of action brought against either party for personal injury, death or property damage of every kind and nature arising in connection with the maintenance of any joint facility, and each party will indemnify and save harmless the other for all claims

-9-

and causes of action brought against the other party, so caused, provided that the situs of the occurrence giving rise to the claim or cause of action is on the right of way of either party or the adjacent facilities. Each party shall give to the other written notice of such claim or cause of action and the other party shall have the right to appear in any suit and resist or defend the same without prejudice to its rights under this lease. In the case of claims or causes of action brought against either party for personal injury, death or property damage of every kind and nature arising in connection with the maintenance of any joint facility, Lessor shall pay 60% and Lessee 40% of all costs, expenses, settlements and judgments in such cases and no settlement shall be made in any such case without the prior approval of the other party hereto; provided that all costs, expenses, settlements and judgments arising out of claims or causes of action to employes or passengers of one party in an accident to a train of that party and proximately caused by negligence in the maintenance of a joint facility, or by an Act of God or by unknown or concealed causes making it impossible to determine the responsibilities, shall be borne by that party whose train is concerned in the accident. Where there is disagreement as to liability between the parties on account of any loss, damage or expense, or if there is a dispute as to proper division of the responsibility for such loss, damage or expense, then within ninety (90) days from the date of the occurrence giving rise thereto, the heads of the Claim Departments of the parties shall agree upon an arbitrator to determine said responsibility; but, if said heads of the Claim Departments are unable to agree upon an arbitrator within such period, the arbitrator may be appointed by any judge of the United States District Court, for the Northern District of Illinois, upon

-10-

ten (10) days' notice in writing of the application for such purpose.

8.

Should the Lessee fail to make the payments herein specified at the times and in the manner hereinbefore provided, time being of the essence of this indenture, or fail to perform any of the other covenants and agreements herein contained by it to be performed, such failure shall constitute a breach of this indenture and if such default shall continue for a period of ninety (90) days after written notice served by the Lessor, this lease shall thereupon terminate and the Lessee shall, upon the expiration of said ninety (90) days, forfeit all rights and interest hereby granted, and the Lessor may thereupon, with or without process of law, exclude the Lessee from the further possession and use of the said demised premises, and the Lessee shall have no claim against the Lessor on account of such exclusion.

9.

Except for subleases to persons to sell articles at Lessee's stations, Lessee may not sublease any of the premises or right of way which are the subject of this lease without prior written approval of Chief Engineer of Lessor.

This agreement shall not become effective until approved by any regulatory authorities whose approval is required, and until the contract between Lessor and Lessee and others concerning the construction of the said trackage and facilities has been fully executed and

-11-

similarly approved.

This lease shall be binding upon and inure to the benefit of the successors and assigns of both parties. This lease is subject to termination (a) at the option of the Trustee of the mortgage dated as of January 1, 1939 between the Lessor and The First National Bank of Chicago upon the occurrence of an event of default as defined in said mortgage, and (b) at the option of the Trustee of the mortgage dated as of January 1, 1939 between the Lessor and the Chemical Corn Exchange Bank of New York upon the occurrence of an event of default as defined in said mortgage.

IN WITNESS WHEREOF, the parties have caused this indenture to be executed in their names and behalf by their respective officers all as of the day first above written.

CHICAGO AND NORTH WESTERN
RAILWAY COMPANY

By _____
President

ATTEST:

_____
Secretary

CHICAGO TRANSIT AUTHORITY

By _____
Chairman
Chicago Transit Board

ATTEST:

_____
Secretary

APPROVED _____
GENERAL MANAGER

AUTHORIZED BY ORDINANCE NO.
58- 25 ____ OF CHICAGO TRANSIT BOARD

_____
ASSISTANT SECRETARY

ADDENDUM TO LEASE NO. 69974 dated January 6, 1959 and Indenture dated July 15, 1960 between the CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a Wisconsin corporation, and the CHICAGO TRANSIT AUTHORITY.

WITNESSETH:

By virtue of said agreements, the CHICAGO AND NORTH WESTERN RAIL-WAY COMPANY and CHICAGO TRANSIT AUTHORITY agree to the deletion of an area of 540 square feet, more or less, shown in green color and the addition of an area of 7,532 square feet shown in yellow color on the print dated October 23, 1968 attached hereto and made a part hereof.

IT IS MUTUALLY AGREED, by and between the undersigned parties as follows:

The aforesaid agreement No. 69974 shall be and the same is hereby modified to reflect the area changes as indicated above, effective November 1, 1968.

The rental of said agreement No. 69974 is hereby increased by $25.00 per month by this Addendum.

Except as hereinbefore provided, all the terms, provisions and convenants contained in said agreements will remain the same.

IN WITNESS WHEREOF, the parties hereto have executed this addendum on _19th_ day of _May_____, 1969 in duplicate.

ATTEST:

_G. L. Vargann_ /s/
Asst. Secretary

CHICAGO AND NORTH WESTERN RAILWAY COMPANY
By _Larry N. Crane_ /s/
Its_____

ATTEST:

_A. Hedberg_
Secretary

CHICAGO TRANSIT AUTHORITY
By _G. D. Mann_
Its_Chairman, Chicago Transit Board_

APPROVED:

_____

AUTHORIZED BY ORDINANCE NO.
69-73 OF CHICAGO TRANSIT BOARD

_A. Hedberg_
ASSISTANT SECRETARY

APPROVED:

_Robert W. Mickey_
ASSISTANT VICE PRESIDENT
AND DIRECTOR OF REAL ESTATE

APPROVED AS TO FORM

_____
ATTORNEY

Approved as to Engineering

_____
CHIEF ENGINEER



Revised 11-17-59

THIS INDENTURE, made this *15th* day of *July*

19*60*, between CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, as Lessor, and CHICAGO TRANSIT AUTHORITY, a municipal corporation of Illinois, as Lessee, WITNESSETH:

Whereas, the Lessor and the Lessee have, under date of January 6, 1959, entered into an indenture of lease of property on the right of way of the Lessor, between the west line of Laramie Avenue in the City of Chicago, and the west line of Harlem Avenue in the Village of Oak Park, and the parties now propose by this indenture to enter into a lease for property of the Lessor lying immediately west of the property covered by said lease dated January 6, 1959,

Now, Therefore, this indenture witnesseth:

1.

The Lessor, for and in consideration of the rents, covenants and conditions herein expressed on the part of the Lessee, to be paid, kept and performed, does hereby lease for passenger transportation purposes unto the said Lessee, its successors and assigns, that part of the right of way of the Lessor located in the Village of Forest Park, State of Illinois, as shown on the plat attached hereto marked Exhibit A, reserving unto the Lessor the right to use the property over said right of way, providing such use by Lessor does not interfere with the Lessee's use of said right of way for passenger transportation and storage purposes.

To have and to hold said right of way and all benefits and advantages thereof for passenger transportation and storage purposes unto the said Lessee for and during and until the full term of this perpetual lease, provided, however, that this lease shall terminate at any time

-2-

the Lessor or Lessee, or their respective successors, discontinue trans-
portation operations and the storage of cars on said right of way.

The Lessor will sell and convey to the Lessee the two tracks
now on said demised right of way for $17,480.00 which represents one-half
the present depreciated value of said two tracks, effective and payable when
the additional tracks and facilities specified in the construction contracts
between the parties have been turned over to Lessor.

2.

The Lessee, its successors and assigns, in consideration of
the premises and of the covenants herein contained on the part of the Les-
sor, will pay to the Lessor as and for the rent of said premises the sum
of $750.42 monthly, beginning on the same date the rental begins in the
said lease between the parties, dated January 6, 1959, above referred
to, a copy of which is attached hereto.

The estimated amount of the taxes for the year 1956 on the
entire right of way of the Lessor from the west line of the property leased
pursuant to said lease dated January 6, 1959, to the western point of the
property leased herein is $4,076.00 and 40% of said sum, or $1,630.40,
is included as a part of the annual rental to be paid by the Lessee hereunder.
The Lessor will recompute such applicable taxes when finally determined
at the end of each five-year period in the same manner used to compute
the monthly amount of $750.42, and the rental will then be adjusted ac-
cordingly. In addition, any increase in the annual Illinois ad valorem
taxes allocable to and occasioned by rentals received by the Lessor from
the demised property shall be added to rentals for the next five-year
period and the rental automatically adjusted accordingly. In the event

-4-

immediately determine the valuation of the area of the right of way at the end of said ten-year period and shall notify the parties of their decision whereupon the rental to be paid for the ensuing ten-year period shall be based upon the valuation so determined. If there is an increase in the value of the land the Lessee will pay 10% of 40% of the increase in value as additional annual rental. If there is a decrease in the value of the land the annual rental shall be decreased by 10% of 40% of the decrease in value.

3.

Lessee will at all times during the term of this lease at its expense operate a public transportation system upon said right of way, or use said property for storage purposes, and maintain and keep the same and everything appertaining thereto in good order, condition and repair.

4.

The provisions of Sections 3, 4, 5, 7, 8 and 9 of the lease between the parties hereto dated January 6, 1959, shall be incorporated in this lease as though fully herein set forth.

IN WITNESS WHEREOF, the parties have caused this

-5-

indenture to be executed in their names and behalf by their respective

officers all as of the day first above written.

CHICAGO AND NORTH WESTERN
RAILWAY COMPANY

By _____
                    President

ATTEST:

_____
Assistant Secretary

CHICAGO TRANSIT AUTHORITY

By _____
                    Chairman
              Chicago Transit Board

ATTEST:

_____
Secretary

APPROVED _____

_____
GENERAL MANAGER

APPROVED AS TO
FORM

AUTHORIZED BY ORDINANCE NO.
59.220 OF CHICAGO TRANSIT BOARD

_____
ASSISTANT SECRETARY



**CHICAGO TRANSIT AUTHORITY**

567 West Lake Street
Chicago, Illinois 60661-1498
TEL 312 664-7200
www.transitchicago.com

**BY CERTIFIED MAIL –**
**RETURN RECEIPT REQUESTED**

July 12, 2006

Mr. Dennis D. Brown
General Director-Real Estate
Union Pacific Railroad
1400 Douglas Street, Stop 1690
Omaha, Nebraska 68179-1690

         **Re:**   **Chicago Transit Authority**
               **Green Line-Union Pacific Easement**
               Laramie Avenue in Chicago to Harlem Avenue in Oak Park, and 1,675'
               West of Harlem Avenue in Forest Park, Illinois

Dear Mr. Brown:

The public records indicate that Union Pacific Railroad is the owner of, or has an interest in the rail property from Laramie Avenue in Chicago to Harlem Avenue in Oak Park and 1,675 feet west of Harlem Avenue in Forest Park, Illinois. CTA currently operates on part of Union Pacific's right-of-way under a lease agreement. This property is further described on the attached Exhibit A. (Lease R-O-W Plats).

On June 14, 2006, the Chicago Transit Board of the Chicago Transit Authority passed an ordinance authorizing the purchase of an easement interest as described on Exhibit A. This project is undertaken in accordance with the Metropolitan Transit Authority Act. The Chicago Transit Board has authorized the commencement of acquisition of the subject property.

The Chicago Transit Authority hereby offers to pay the sum of **Seven Million Five Hundred Sixty Four Thousand Four Hundred Dollars ($7,564,400.00)** for acquisition of a perpetual easement of the subject property including road property, bridges, retaining walls, and buildings and improvements thereon free and clear of all taxes, special assessments, liens, environmental contamination, encumbrances, or claims of any kind and nature. The amount of this offer is based upon the Chicago Transit Authority's inspection of the property and its consideration of the appraisal of the property prepared by an independent appraiser. This offer is contingent upon final approval by the Chicago Transit Board, and that the subject property is in a satisfactory environmental condition.



**EXHIBIT**

Mr. Dennis D. Brown
July 11, 2006
Page 2


This offer will remain open for a period of fourteen (14) days from the date of this letter. If we do not hear from you within fourteen (14) days, we must conclude that you are not interested in a voluntary sale of the property and that this offer is rejected. In this event, the Chicago Transit Authority intends to commence legal proceedings to acquire the subject property under the eminent domain law.

If you are interested in this offer or have any questions, please contact our attorney, Francine D. Lynch at Neal & Leroy, L.L.C., 203 N. LaSalle Street, Suite 2300, Chicago, Illinois 60601. She can be reached at (312) 641-7144.

Very truly yours,

*Kathleen H. Herrmann*

Kathleen H. Herrmann, Director
Property & Real Estate Asset Management


KHH:brg

Enc.

cc:    Eugene Munin
       Carla Davis
       Eric Oesterle


539-1







