**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 07-cv-229 |
| CHICAGO TRANSIT AUTHORITY, | ) ) ) ) | Judge Robert M. Dow, Jr. |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Currently pending before the Court are Plaintiff Union Pacific's ("UP") motion for partial summary judgment [91] and Defendant Chicago Transit Authority's ("CTA") motion for judgment on the pleadings [89]. For the reasons set forth below, Plaintiff's motion is granted and Defendant's motion is denied.[1]

**I.      Procedural Background**

UP filed its complaint [1] after CTA commenced state law condemnation proceedings pursuant to 735 ILCS 30/10-5-10. The Chicago Transit Authority's ultimate aim in the condemnation proceedings is to effect a taking of property that CTA currently leases from UP under a perpetual lease. The proposed taking would effectively convert CTA's lease into an easement. UP contends that CTA's proposed use of condemnation authority is preempted by federal law (specifically the Interstate Commerce Commission Termination Act (49 U.S.C. §

---

[1] Because the federal preemption issue proves dispositive, the Court need not address the parties' Commerce Clause arguments. See, *e.g.*, *Buffalo Southern R.R., Inc. v. Village of Croton-on-Hudson*, 434 F. Supp. 2d 241, 255-56 (S.D.N.Y. 2006) (declining to reach constitutional question arising under Commerce Clause where resolution of other issues in case were dispositive).

10101 *et seq.*) ("ICCTA" or "the Act")) and runs afoul of the Commerce Clause of the United States Constitution (Art. I., § 8, cl. 2). Union Pacific's complaint requests declaratory and injunctive relief.

After discovery closed, UP filed a motion for partial summary judgment [91] seeking a determination that CTA's state law condemnation proceedings are preempted by federal law. On the same day, CTA filed a motion for judgment on the pleadings [89], requesting a determination that neither federal statutory law nor the Commerce Clause is a bar to CTA's state law condemnation proceedings. The Court will construe CTA's motion for judgment on the pleadings as a cross motion for summary judgment. See *Church v. General Motors Corp.*, 74 F.3d 795, 798 (7th Cir. 1996) (construing a motion for judgment on the pleadings as a motion for summary judgment where evidence outside the pleadings was presented to the district court and "not rejected").[2]

---

[2] Construing CTA's motion for judgment on the pleadings as a cross motion for summary judgment is appropriate because the Court is considering matters outside of the pleadings in resolving the motion. *Carter v. Stanton*, 405 U.S. 669, 671 (1972). Federal Rule of Civil Procedure 12(d) provides that when a Court construes a motion for judgment on the pleadings as motion for summary judgment, all parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). That requirement easily is satisfied here, because in opposing UP's motion for partial summary judgment, CTA presented record evidence in its response to UP's Local Rule 56.1 statement of facts and in CTA's own Local Rule 56.1 statement of additional facts. See *Carter v. Signode Industries, Inc.*, 688 F. Supp. 1283, 1284 (N.D. Ill. 1988). Moreover, in its motion for judgment on the pleadings, CTA seeks the very same relief that it seeks in its opposition to UP's motion – in other words, the evidence on which CTA relies in its opposition to UP's motion for summary judgment is germane to the matters raised in CTA's own motion. In any event, converting CTA's motion for judgment on the pleadings puts its motion on sounder footing than it otherwise would have been because the motion as originally styled surely would have been denied. "A motion for judgment on the pleadings may be granted only if the moving party establishes that no material issue of fact remains to be resolved and that he or she is entitled to judgment as a matter of law." *National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987). In this case, the inquiry is simple because considering only the pleadings would have the effect of excluding material issues of fact that came to light during discovery and that, it turns out, entitle the *plaintiff* to judgment as a matter of law.

## II. Facts

### A. Local Standards on Summary Judgment

The Court takes the relevant facts from the parties' respective Local Rule ("L.R.") 56.1 statements.[3] The Court expresses no position as to whose version of disputed factual matters is correct. Local Rule 56.1 requires that statements of fact contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)).

Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider the statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards additional statements of fact contained in a party's response rather than in its statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317).

---

[3] See [92], UP's Local Rule 56.1(a)(3) Statement of Facts ("Pl. SOF"); [104], Defendant's Response to UP's Local Rule 56.1(a)(3) Statement of Facts ("Def. Resp. Pl. SOF"); [105], Defendant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts ("Def. SOAF"); [112], UP's Response to Defendant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts ("Pl. Resp. Def. SOF").

### B. Pertinent Facts for Purposes of Cross-Motions for Summary Judgment

In 1959, CTA and UP's predecessor entity entered into a lease ("the Lease") of the property at issue. Def. Resp. Pl. SOF ¶¶ 20, 24. The property at issue ("the Right of Way") is ninety to ninety-five feet wide in most places and runs east-west for approximately 2.8 miles, from Laramie Avenue (in Chicago) to beyond Harlem Avenue (in Oak Park, Illinois). Def. Resp. Pl. SOF ¶¶ 13, 14. Union Pacific operates three railroad tracks, and CTA operates two railroad tracks, along the Right of Way. Def. Resp. Pl. SOF ¶¶ 15, 21; Pl. Resp. Def. SOAF ¶ 2. Rail traffic along the Right of Way is "among the most intense" in UP's interstate rail network. Def. Resp. Pl. SOF ¶ 19.

The Lease, which has been amended a handful of times (Def. Resp. Pl. SOF ¶ 24), outlines the rights and obligations of the lessor (UP) and the lessee (CTA) and provides for the termination of the lease in certain circumstances. See Def. Resp. Pl. SOF ¶¶ 39, 41, 43. The Lease has several important features. Among those features are that the Lease restricts the type of traffic that CTA can run along the Right of Way, requires the CTA to obtain UP's approval before making "additions, alterations or changes" to the Right of Way, and requires CTA to ensure that everything related to CTA's operations on the Right of Way is in "good order, condition, and repair." Def. Resp. Pl. SOF ¶¶ 25-28. The Lease also describes the parties' respective burdens with respect to maintenance of jointly used facilities (certain retaining walls, bridges, support structures, and the like). Def. Resp. Pl. SOF ¶¶ 32-35. In addition, the lease can terminate if CTA defaults on its obligations under the lease or either party ceases its rail operations (Def. Resp. Pl. SOF ¶¶ 39, 41), at which point UP is entitled to re-take its property and eject CTA (Def. Resp. Pl. SOF ¶ 43). Otherwise, the Lease will not terminate. The

possibility of future possession of the leased Right of Way has "substantial economic and strategic value" to UP. Pl. SOF ¶ 45.

In the end, a dispute over money appears to have paved the way for the instant legal action. The amount of rent that CTA pays under the Lease is recalculated every ten years based on the fair market value of the Right of Way. Def. Resp. Pl. SOF ¶ 46. In their most recent discussions, the parties varied widely on the proposed amount of rent. Compare Def. Resp. Pl. SOF ¶ 52 ($30.8 million), with Def. Resp. Pl. SOF ¶ 54 ($11.3 million). During that rent dispute, the parties engaged in discussions for a one-time payment by CTA that would have replaced the Lease with an easement. Def. Resp. Pl. SOF ¶ 59. The negotiations for an easement ended when CTA presented UP with both a carrot and a stick: CTA offered to pay UP $7,564,400 for a "perpetual easement" in the Right of Way, or else CTA would initiate condemnation proceedings. Pl. SOF ¶ 63. Union Pacific declined the offer (Def. Resp. Pl. SOF ¶ 64), and CTA resorted to the stick, initiating condemnation proceedings before the Illinois Commerce Commission (Pl. SOF ¶ 65).

The CTA's takings petition, as amended, describes the proposed easement that CTA seeks to take ("the Easement"). Based on the petition, the Easement has three salient features: (1) the "property sought to be condemned * * * is a perpetual easement upon such property that is coextensive with the Lease;" (2) under the easement "CTA shall succeed to its obligations, and shall have the benefit of its rights," under the Lease; and (3) *"CTA's * * * rights under the easement shall * * * not be subject to termination for any reason."* Def. Resp. Pl. SOF ¶ 66 (emphasis added).

CTA admits that under the proposed Easement, UP "will not have the ability to evict the CTA from operating along the right of way" in the event of a breach. Def. Resp. Pl. SOF ¶ 68.

5

The Lease currently specifies that, after written notice and 90 days, a failure by CTA to perform any of the covenants in the lease gives UP the right, "with or without process of law, [to] exclude the [CTA] from the further possession and use of" the Right of Way. Def. Resp. Pl. SOF ¶ 43; [116], ex. D at 13. CTA's response to UP's Local Rule 56.1(a)(3) Statement of Facts clarifies that which is not obvious from the plain language of CTA's takings petition: the proposed Easement is not actually "coextensive" with the lease (Def. Resp. Pl. SOF ¶ 66) because although CTA "succeed[s] to its obligations" and rights under the Lease (*id.*), UP *does not* succeed to all of its remedies: it would lose the ability to evict CTA for a breach of the Lease and re-take its property.

### III. Analysis

#### A. Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, a "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### B. Federal Preemption Law and the ICCTA

The basic principles of preemption law are both relatively straightforward and well-established. The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Since *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). When determining if such a conflict exists, the "purpose of Congress" is the ultimate touchstone. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

In general, there are three settings in which a state law conflicts with, and hence is preempted by, federal law: (1) express preemption, in which Congress "define[s] explicitly the extent to which its enactments pre-empt state law;" (2) field preemption, in which state law is pre-empted because "it regulates conduct in a field that Congress intended the federal government to occupy exclusively;" and (3) conflict preemption, in which, for example, complying with both federal and state law is a physical impossibility. *English v. General Elec.*

7

*Co.*, 496 U.S. 72, 78-79 & n. 5 (1990) (explaining that the three categories are not "rigidly distinct"); see also *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997).

Particularly pertinent for present purposes is express preemption. See *English,* 496 U.S. at 79 ("[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one"). The Supreme Court teaches that the *scope* of express preemption is informed by (a) the presumption that Congress "does not cavalierly pre-empt state-law causes of action," and (b) the purpose of Congress in enacting the legislation, as revealed by the text, statutory framework and "the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Lohr*, 518 U.S. at 485.

### 1. The ICCTA Expressly Preempts Regulation of "Transportation" by Rail Carriers

When it enacted the Interstate Commerce Commission Termination Act, Congress included an express preemption provision to effectuate its aim of centralizing railroad regulation. The preemption provision at once describes the breadth of the federal Surface Transportation Board's ("STB") jurisdiction and eliminates the jurisdiction of states over railroad regulation:

> The jurisdiction of the Board over transportation by rail carriers * * * is *exclusive*. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b) (emphasis added). As defined in the Act, "transportation" has a meaning that is far broader than the term's ordinary meaning; the term includes "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, *property*, facility, instrumentality, *or equipment of any kind* related to the movement of passengers or property, or both, by rail,

regardless of ownership or agreement concerning use." 49 U.S.C. § 10102(9)(A) (emphasis added).

In view of that panoptic definition of transportation, the Court agrees that "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations" than the language contained in Section 10501(b). *CSX Transp. v. Georgia Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996). The overwhelming weight of authority accords with that view. See, *e.g.*, *Franks Investment Co., LLC v. Union Pac. R.R.*, 534 F.3d 443, 446, 449 (5th Cir. 2008) (noting the breadth of, and lack of ambiguity in, § 10501(b)); *City of Lincoln v. S.T.B.*, 414 F.3d 858, 861 (8th Cir. 2005) (reviewing an STB decision "in the context of the Board's broad authority over rail transportation"); *City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998) (reasoning that "nothing in the case law" supported a narrower interpretation of Section 10501(b)); *Wisconsin Cent. LTD v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013 (W.D. Wis. 2000) ("It is clear that the ICCTA has preempted all state efforts to regulate rail transportation"); *City of Creede, CO—Pet. for Declaratory Order*, 2005 WL 1024483 (S.T.B. May 3, 2005) (collecting cases and observing that "[e]very court that has examined the statutory language has concluded that the preemptive effect of section 10501(b) is broad and sweeping").

The history of regulation in this realm and the evolution of the statutory scheme confirm the broad reading of Section 10501(b): Congress's unambiguous intent in enacting the IICTA was to unburden railroads from regulation while consolidating the remaining regulatory work in federal hands. Accord House Rep. No. 104-311, at 90-93 (1995), reprinted in 1995 U.S.C.C.A.N. 164, 802-05. By means of the Interstate Commerce Act (ch. 104, 24 Stat. 379 (1887)), the federal government has exerted control over interstate rail transportation for more

9

than one hundred twenty years.  (The Interstate Commerce Act, as amended, includes the ICCTA.  See 49 U.S.C.A. Subt. IV, Interstate Commerce Act Disposition Tables.)  The Supreme Court has noted that the Interstate Commerce Act is "among the most pervasive and comprehensive of federal regulatory schemes" (*Chicago & Nw. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981)), and that the reach of federal authority over railroads "frequently" leads to the invalidation of state regulations.  *Id.*  See also *City of Auburn*, 154 F.3d at 1029 (collecting Supreme Court railroad preemption cases); *CSX Transp.*, 944 F. Supp. at 1582-85 (describing the history of railroad regulation and placing the ICCTA in the context of that history).

Recent decades have seen Congress move to concentrate regulatory authority over railroads in the federal government.  Prior to 1980, the Interstate Commerce Commission ("ICC") "was empowered to preempt state regulation of intrastate lines" only in certain circumstances.  See *City of Auburn*, 154 F.3d at 1029 n. 6.  In 1980, Congress passed the Staggers Rail Act (Pub. L. No. 96-448, 94 Stat. 1895 (1980) ("the Staggers Act")), the predecessor statute of the ICCTA.  The Staggers Act further narrowed the state regulatory playing field by preempting state regulation of intrastate rail practices (although Congress created an exception to preemption where the state employed federal standards and obtained certification from the ICC).  See *CSX Transp.*, 944 F. Supp. at 1583; Staggers Rail Act of 1980, Pub. L. No. 96-448, § 214(b), 94 Stat. 1895, 1913.  The Staggers Act's regulatory winnowing was consistent with the legislation's stated purposes, which included fostering competition and minimizing "regulatory control over the rail transportation system."  Staggers Act, § 101(a).  Finally, when Congress enacted the ICCTA, it completed the deregulatory trend, codifying in Section 10501(b) "the exclusivity of Federal remedies with respect to the regulation of rail

10

transportation." House Conf. Rep. No. 104-22, at 167 (1995), reprinted in 1995 U.S.C.C.A.N. 164, 852.

In sum, although the Supreme Court's decision in *Lohr* teaches that the scope of an express preemption provision should be read in light of a presumption that Congress does not cavalierly preempt state remedies, the history and sequence of legislation in the area of railroad "transportation" reveal that Congress's actions were anything but cavalier. Rather, they were the result of a considered policy of deregulation.

Given the broad preemptive reach of Section 10501(b), the task for this Court is to determine (i) whether CTA's condemnation proceeding concerns "transportation" by a "rail carrier," and (ii) whether the condemnation is a form of "regulation." CTA's state law condemnation proceedings are preempted only if the answer to both questions is yes. *Cf. Cipollone*, 505 U.S. at 517 ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted").

### 2. CTA's Condemnation Action Concerns "Transportation" by a "Rail Carrier"

The Right of Way (and that which it comprises) falls squarely within the definition of "transportation" in 49 U.S.C. § 10102(9). The proposed Easement touches and concerns the 2.8 mile Right of Way, bridges, retaining walls, abutment walls, the "Oak Park station subway," and "street facilities" under the Right of Way. Def. Resp. Pl. SOF ¶¶ 13, 15, 32. Moreover, the "joint facilities" shared by UP and CTA "extend under and provide physical support for the entire elevated Right of Way, including the portion leased to the CTA." Def. Resp. Pl. SOF ¶ 33. These features can variously be described as "property," "facilit[ies]," "instrumentalit[ies]," and "equipment" that "relate[] to the movement of passengers or property, or both, by rail." See 49 U.S.C. § 10102(9).

11

Under the Act, a rail carrier "means a person providing common carrier railroad transportation for compensation * * *." 49 U.S.C. § 10102(5). On the undisputed facts, UP falls within the definition of a "rail carrier." See Def. Resp. Pl. SOF ¶ 1 ("Union Pacific is a rail common carrier engaged primarily in the business of interstate freight rail transportation").

### 3. CTA's Condemnation Action is a (Preempted) Form of Regulation

Because UP is a rail carrier engaged in transportation, the only remaining question is whether the CTA's proposed condemnation is a "regulation." That term is not defined in the statute, but its dictionary definition jibes with its common meaning: regulation is the "act or process of controlling by rule or restriction." BLACK'S LAW DICTIONARY 1311 (8th ed. 2004); *City of Marshfield*, 160 F. Supp. 2d at 1013. Because the Court concludes that CTA's condemnation proceeding is a form of regulation, the action is preempted. In reaching this conclusion, the Court notes that nearly every judicial or STB opinion to have considered the question has concluded that the use of eminent domain power is a preempted form of state regulation. CTA's arguments and authorities to the contrary prove unconvincing.

As an initial matter, courts have employed a variety of tests for determining whether a particular non-federal action is a preempted regulation under the ICCTA.[4] One particularly helpful gloss on the ICCTA preemption case law, however, is that certain types of state regulation are considered preempted *per se* and other regulations are analyzed "as applied." See, *e.g.*, *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 644-45 (2d Cir. 2005) (holding that a

---

[4] For example, one court has stated that a state's action must "pass" a two-part test to avoid preemption: (1) it must not be unreasonably burdensome and (2) it must not discriminate against railroads. *New York Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3d Cir. 2007) (citing *Maumee & W. Ry. Corp.*, 2004 WL 395835, at *2 (S.T.B. 2004)). Another case, evaluating a state land use law that would have affected a railroad's ability to construct a transloading facility, used a five-part test. See *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643-44 (2d. Cir. 2005) (reasoning that "states and towns may exercise traditional police powers over the development of railroad property" to the extent they complied with the five specified limitations, but finding the act facially preempted).

state's land use statute was preempted and concluding that a fact-based inquiry was unnecessary in order to resolve the case). As the STB has noted:

> [C]ourts have found two broad categories of state and local actions to be preempted regardless of the context or rationale for the action. The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized.
>
> Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; rail mergers, line acquisitions, and other forms of consolidation; and railroad rates and service. * * * For state or local actions that are not facially preempted, the Section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation.

*CSX Transp., Inc—Pet. for Declaratory Order*, 2005 WL 1024490, *2-3 (S.T.B. May 3, 2005) (citations omitted); see also *Adrian & Blissfield R.R. Co. v. Village of Blissfield*, 550 F.3d 533, 539-40 (6th Cir. 2008) (describing *per se* and as applied preemption under the ICCTA); *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 331-33 (5th Cir. 2008) (same).

The Court concludes that CTA's proposed taking is the type of action that belongs in the *per se* camp. As with the categorical prohibitions that other courts have found, taking an easement that gives to CTA an exclusive, perpetual right to occupy UP's property "would directly conflict with the exclusive federal regulation of railroads." *CSX Transp.*, 2005 WL 1024490, at *3. Like the zoning and land use cases that conclude that certain state conduct is categorically preempted,[5] CTA's proposed taking is "impermissibly attempting to subject to state law property that Congress specifically put out of reach." *City of Marshfield*, 160 F. Supp. 2d at

---

[5] See also *City of Auburn*, 154 F.3d at 1029-31 ("[T]he pivotal question is not the nature of the state regulation, but the language and congressional intent of the specific statute"); *City of Marshfield*, 160 F. Supp. 2d at 1013 (holding that "condemnation is regulation" and omitting references to the as-applied framework); *Norfolk S. Ry. Co. v. City of Austell*, 1997 WL 1113647, at *4-6 (N.D. Ga. Aug. 18, 1997) (facial preemption of zoning limitation that would have prevented the plaintiff from constructing and operating an intermodal facility).

1013-14; see also *Green Mountain*, 404 F.3d at 645 ("[T]he State's effort to regulate rail transportation through [a pre-construction permitting process] is necessarily preempted").

Indeed, at least three other courts have concluded that eminent domain proceedings against rail property were a preempted form of state regulation. Most similar to the facts of this case, the court in *City of Marshfield* held that the ICCTA preempted the use of an eminent domain statute to condemn 6,800 feet of the plaintiff's passing track. 160 F. Supp. 2d at 1012-14. It did not matter to the court that the city merely wanted the railroad to relocate its track: "In using state law to condemn the track defendant is exercising control – the most extreme type of control – over rail transportation as it is defined in section 10102(9)." *Id.* at 1013. Moreover, the Court did not even mention the as applied, "unreasonable interference" framework,[6] instead holding unambiguously that "condemnation is regulation." *Id.* Similarly, in *Buffalo S. R.R. Inc. v. Village of Croton-on-Hudson*, the court unequivocally ruled that eminent domain proceedings against a rail yard "exceed[] what is permitted under the ICCTA." 434 F. Supp. 2d 241, 244, 249 (S.D.N.Y. 2006). Although the court in that case purported to resort to the as applied framework and stated that making such a determination was a fact intensive inquiry (*id.* at 248-49) the court also concluded that there was "no question" that a taking of an entire rail yard that was used as a transloading facility was impermissible (*id.*). To be sure, some of the condemnation cases at least nominally refer to the as applied framework (or something like it), but there appears to be only a single case, *District of Columbia v. 109,205.5 Square Feet of Land*, 2005 WL 975745 (D.D.C. Apr. 21, 2005), in which a federal court actually has held that condemnation was not preempted by the ICCTA. Because the Court agrees with the authorities

---

[6] Although specific formulations vary, the essential question in an as applied framework is whether the state regulation unreasonably or unduly interferes with railroad operations. See, *e.g.*, *Maumee & W. R.R. Corp and RMW Ventures, LLC—Pet. for Declaratory Order*, 2004 WL 395835, at *1.

14

cited by UP holding that condemnation is an extreme form of regulation, the Court respectfully declines to follow the interpretation set forth in *District of Columbia*.[7]

Moreover, the analysis does not change merely because CTA is seeking to bootstrap its condemnation proceedings onto its currently operative Lease with UP. The Court need not decide what the outcome would be were CTA seeking an easement that truly was coextensive with the Lease;[8] CTA's easement is *not* coextensive with the Lease. It would eliminate UP's current right to re-take the property in the event that CTA defaults or ceases operations. If UP is unable to exclude CTA from the Right of Way, it will not matter that CTA technically "succeeds to its obligations" to, among other things, run only passenger trains and pay forty-percent of maintenance cost for the joint facilities (Def. Resp. Pl. SOF ¶ 35) along the Right of Way. If violating those provisions is costless (or low-cost), UP may find itself in the position of a pestering debt collector rather than a landlord with a potent self-help remedy. Had UP contracted with CTA for such a relationship there would be no preemption problem. See *Sacramento Reg'l Transit Dist.—Pet. for Declaratory Order*, 2000 WL 893421, at *1-2 (S.T.B. June 29, 2000) (no federal preemption of a voluntary sale). But by seeking to impose on UP the terms associated with the use of UP's Right of Way, CTA is acting in a quintessentially regulatory capacity: it is "controlling, by rule or restriction" (BLACK'S LAW DICTIONARY at

---

[7] As far as the Court can determine, only *District of Columbia*, in which the district court held that the District of Columbia was not preempted from taking two parcels of land for a pedestrian and bike trail, supports CTA's argument. See 2005 WL 975745, at *3.

[8] Consider whether such a case could arise given that the characteristics, rights, and remedies associated with a leasehold interest may vary from those associated with an easement. And if a state or local government were able to devise an easement that truly mirrored a lease, it is unclear whether there would be any need or desire to effect a taking in the first place.

1311) UP's ability to eject CTA and re-take its property. This, Section 10501(b) of the ICCTA tells us, CTA cannot do.[9]

The parties' pleadings do not address the distinction between categories of regulation that are preempted *per se* and those that are subject to more fact intensive inquiry. Instead, CTA argues that the question "is whether the condemnation action will unreasonably interfere with the railroad's operations" (*i.e.*, under the "as applied" framework). Def. Resp. Pl. Mot. Summ. J. at 1. For that proposition, CTA leans heavily on the STB's decision in *Maumee & W. R.R. Corp. & RMW Ventures, LLC—Pet. for Declaratory Order*, 2004 WL 395835 (S.T.B. Mar. 2, 2004). In *Maumee*, the STB declined to interfere with local condemnation proceedings aimed at allowing a city to acquire an easement to construct a public, at-grade crossing over the railroad's line. In reaching its decision, the STB concluded that "routine, non-conflicting uses, such as non-exclusive easements for at-grade rail crossings, road crossings, wire crossings, sewer crossings, etc., are not preempted so long as they would not impede rail operations or pose undue safety risks." *Id.* at *2.

But even viewing CTA's proposed taking through the more fact intensive, as applied framework, the Court concludes that Plaintiff still is entitled to summary judgment on the undisputed facts of this case. The Court reaches this conclusion because the proposed easement (i) would affect actively used railroad property and (ii) is massive both with respect to the land area that it would take and the facilities that it would affect.

---

[9] Although it does not enter into the Court's analysis of this case, the Court notes that since the parties' dispute began, Congress created a mechanism for resolving disputes between local commuter systems and rail carriers. See 49 U.S.C. §§ 28502, 28503. Under the provisions, when a "public transportation authority" cannot reach agreement with a rail carrier regarding use of the trackage of a rail carrier or the acquisition of an interest in a right of way, either party "may apply to the Board for nonbinding mediation." See *id*.

CTA's proposed taking would affect actively used railroad property. In the handful of takings cases that have dealt with actively used railroad property, courts have found preemption. See, *e.g.*, *City of Marshfield*, 160 F. Supp. 2d at 1011 (passing track); *Village of Croton-on-Hudson*, 434 F. Supp. 2d at 244 (industrial rail yard containing track). For example, in *City of Lincoln—Pet. for Declaratory Order*, the STB held that taking a five-block long, twenty-foot wide swath of a railroad's right of way would unduly interfere with railroad transportation. See 2004 WL 1802302, *2-4 (S.T.B. Aug. 11, 2004). In reaching its determination, the STB characterized the city's "request to allow a taking of actively used railroad property" as "extraordinary." *Id.* at *4. See also *City of Lincoln*, 414 F.3d at 862 (upholding the STB's decision). Even in *District of Columbia*, the single case that works in Defendant's favor, there is little to indicate that the land that the District of Columbia sought for pedestrian use was actively used railroad property.[10] See 2005 WL 975745, at *2-3. In contrast, the traffic on the property that CTA seeks is "among the most intense on Union Pacific's interstate railroad." Def. Resp. Pl. SOF ¶ 19. And far from being a "routine, non-conflicting use" (*Maumee*, 2004 WL 395835, at *2), CTA runs more than 60 commuter trains on the Right of Way and Plaintiff operates more than 30 freight trains on the right of way. Def. Resp. Pl. SOF ¶¶ 7-18. The distance between UP's tracks and the property that CTA uses is just five feet, and UP must use "non-standard procedures" for inspection and maintenance of the Right of Way. Def. Resp. Pl. SOF ¶¶ 22-23.

Moreover, the Right of Way is not just actively used; it is massive. The Right of Way is 2.8 miles long, which means that CTA operates about 29,000 feet of track on the Right of Way. The total land area in the Right of Way is about 1,407,812 square feet (or 32 acres). Def. Resp. Pl. SOF ¶ 14. And because CTA uses approximately 40 percent of the Right of Way (Def. Resp.

---

[10] Based on the limited factual background provided in the court's opinion, it appears that, at most, the railroad might have been using the parcels in question to access signal boxes and perform other track maintenance. See *District of Columbia*, 2005 WL 975745, at *3.

Pl. SOF ¶ 21), the proposed easement comprises approximately 563,125 square feet (a little under 13 acres). Such a proposed taking simply dwarfs the amount of land at issue in *District of Columbia*, and exceeds the amount of land at issue in all of the other ICCTA takings cases of which the Court is aware. See *District of Columbia*, 2005 WL 975745, at *1 (easement over 194,855 square feet); *Village of Croton-on-Hudson*, 434 F. Supp. 2d at 244 (acquisition of approximately 10 acres); *City of Marshfield*, 160 F. Supp. 2d at 1011 (removal of 6,800 feet of passing track); *City of Lincoln*, 2004 WL 1802302, at *1 (acquisition of twenty-foot wide, five-block long strip of land). And allowing Defendant to take the proposed Easement would affect Plaintiff's rights not only to the square footage involved, but also with respect to its legal rights regarding maintenance of the joint facilities along the Right of Way – including twenty-two bridges and other support structures. See Wilson Dep. 25, Sept. 19, 2007.

Under the as applied framework, too, the fact that Defendant is seeking to convert its lease into an easement does not change the analysis. The unilateral change of Plaintiff's rights with respect to this massive stretch of railroad property, including its right to eject Defendant, itself would constitute unreasonable interference.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for partial summary judgment [91] is granted and Defendant's motion for judgment on the pleadings [89] is denied.

Dated: February 23, 2009

Robert M. Dow, Jr.
United States District Judge